*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

ROBERT LEE FREEMAN, JR.,

        Defendant-Appellant.

UNPUBLISHED
April 21, 2026
11:29 AM

No. 370852
St. Clair Circuit Court
LC No. 23-001862-FH

Before: GADOLA, C.J., and MURRAY and M. J. KELLY, JJ.

PER CURIAM.

Defendant Robert Lee Freeman, Jr. appeals as of right his jury-trial conviction of possession of methamphetamine with the intent to deliver, MCL 333.7401(2)(b)(*i*). Defendant was sentenced as a fourth-offense habitual offender, MCL 769.12, to 17 to 50 years' imprisonment. We affirm defendant's conviction but vacate his sentence and remand for the limited purpose of allowing defendant an opportunity for meaningful allocution at his resentencing.

## I. FACTUAL AND PROCEDURAL HISTORY

This case arose from a traffic stop conducted by members of the St. Clair County Drug Task Force. On August 23, 2023, Officer Brian Daly, a plain clothes Drug Task Force member with the Port Huron Police Department, was conducting surveillance of defendant's car in the area of 1901 16th Street for approximately two hours. When defendant returned to the car and drove away from the area, Officer Daly followed in his unmarked car. Officer Daly testified that he observed defendant's vehicle go up onto the boulevard, and defendant fail to use his turn signal, and reported these traffic violations to another member of the task force.

That Task Force Member, Deputy Kyle Kaufman, who served as the uniformed presence, testified that he then began following defendant and observed him drive onto the median and, moments later, bounce off of a curb. On the basis of these observations and at the direction of Officer Daly, Deputy Kaufman effectuated a traffic stop of defendant at approximately 7:00 p.m.

The encounter was recorded on Deputy Kaufman's body camera, played for the jury, and admitted into evidence in redacted form. According to Deputy Kaufman, and as seen on the video,

he approached defendant's vehicle and asked defendant if he was okay, given that he had driven off the road. It did not appear to Deputy Kaufman that defendant was experiencing a medical issue, so he asked defendant to step out of the vehicle. Defendant exited the vehicle and stated that he had been using his phone while driving. Deputy Kaufman then obtained defendant's permission to search him.

Officer Daly approached as Deputy Kaufman was beginning the search of defendant's person. His redacted bodycam footage from the search was also admitted into evidence and played for the jury. When doing a pat down, Deputy Kaufman located a bag of suspected marijuana in defendant's pocket, as well as a bridge card of an individual known to the Drug Task Force as someone involved in illegal controlled substances. He testified that he also felt a large bulge in defendant's groin area that was hard and crystal-like in nature, which he believed to be an illegal controlled substance, so he placed defendant in handcuffs and Officer Daly took over the search.

Officer Daly testified that he gave defendant time to take ownership of the substance and retrieve it himself, but defendant stayed mute, so Officer Daly removed the substance from defendant's underwear. Defendant was wearing multiple pairs of underwear and shorts, which Officer Daly, qualified by the court as an expert in local drug trafficking, testified is a common practice for dealers trying to hide drugs. On direct examination, Officer Daly said no when asked: "At any point when you were doing this commentary about the multiple pairs of underwear, when you told them we found this on you, did he ever deny it to you?"

Deputy Kaufman handled the evidence from the search, and he testified that Officer Daly showed him the bag he removed from defendant's underwear, which was a large baggie containing smaller individual baggies holding a crystal-like substance. He ran a TruNarc test on the substance, which tested positive for crystal methamphetamine totaling 79.2 grams. Jerome Waldron, an employee with the Controlled Substance Unit of the Michigan State Police Crime Lab, confirmed that he received the container with multiple baggies and that the substance tested positive for methamphetamine.

Officers also recovered a cell phone belonging to defendant. Drug Task Force member Officer Daniel Stocker transported the cell phone to the Oakland County Computer Crime Lab. The phone contained numerous messages alluding to drug sales, including for crystal methamphetamine, and photographs of what appeared to be a large amount of crystal methamphetamine on a digital scale.

Prior to trial, defendant objected to the qualification of Officer Daly as an expert witness in narcotics trafficking under MRE 702, asserting that Officer Daly's testimony would be simply an opinion without any reliable measure. Defendant also moved to suppress the evidence obtained from the search of his person on the basis that: (1) the traffic stop was unconstitutionally extended in violation of defendant's Fourth Amendment right to be free from unreasonable search and seizure; and (2) he was unlawfully strip searched during the stop in violation of MCL 764.25a. The trial court rejected defendant's arguments regarding Officer Daly and qualified him as an expert witness in narcotics trafficking on the basis of his specialized knowledge, skill, experience, and training. And, following an evidentiary hearing at which Deputy Kaufman and Officer Daly testified, the trial court denied defendant's motion to suppress, ruling that the traffic stop was legal,

and that although the traffic stop became an investigative stop, defendant waived any objection to its validity when he consented to the search of his person, stating:

> The Court finds that the minimally invasive police search performed on this Defendant was not a strip search as defined and contemplated by that statute. However, even if the search of Defendant's person *could* be accurately characterized as a strip search, it was a search to which Defendant consented. It was also a search incident to arrest. The officer who conducted the search also had probable cause to conduct that search.

## II. MOTION TO SUPPRESS

Defendant first asserts, in both his appellate and Standard 4 briefs, that the trial court erred in denying his motion to suppress because the arrest and search violated his Fourth Amendment rights.

As stated in *People v Williams*, 472 Mich 308, 313; 696 NW2d 636 (2005):

> This Court reviews a trial court's findings at a suppression hearing for clear error. *People v Jenkins*, 472 Mich 26, 31; 691 NW2d 759 (2005); *People v Custer*, 465 Mich 319, 325-326; 630 NW2d 870 (2001). But the application of constitutional standards regarding searches and seizures to essentially uncontested facts is entitled to less deference; for this reason, we review de novo the trial court's ultimate ruling on the motion to suppress. *Jenkins, supra*; *People v Oliver*, 464 Mich 184, 191-192; 627 NW2d 297 (2001).

"Both the United States Constitution and the Michigan Constitution guarantee the right of persons to be secure against unreasonable searches and seizures." *People v Pagano*, 507 Mich 26, 31-32; 967 NW2d 590 (2021), citing US Const, Am IV; Const 1963, art 1, § 11. "Reasonableness is measured by examining the totality of circumstances." *People v Williams*, 472 Mich at 314. "Generally, if evidence is unconstitutionally seized, it must be excluded from trial." *People v Dillon*, 296 Mich App 506, 508; 822 NW2d 611 (2012).

Although defendant's appellate counsel appears to concede the lawfulness of the initial traffic stop, defendant asserts in his Standard 4 brief that the stop was merely a pretext for the officers' narcotics investigation. However, the record supports the trial court's conclusion that the initial traffic stop was legal. "[T]he United Supreme Court has held that when there is probable cause to believe that a driver has violated a traffic law, it is constitutional to briefly detain the driver for purposes of addressing the violation even if the officer's subjective intent for stopping the car is based on other factors." *People v Kavanaugh*, 320 Mich App 293, 299; 907 NW2d 845 (2017). At the evidentiary hearing for defendant's motion to suppress, Deputy Kaufman testified that Officer Daly contacted him to report several moving violations committed by defendant, including failure to signal a turn and improper lane usage, which Officer Daly confirmed. Deputy Kaufman also personally observed defendant drive up onto a front lawn. Therefore, Deputy Kaufman had probable cause to initiate the traffic stop.

Further, defendant's continued detention and search did not violate defendant's Fourth Amendment rights. "A traffic stop is reasonable as long as the driver is detained only for the

purpose of allowing an officer to ask reasonable questions concerning the violation of law and its context for a reasonable period." *Williams*, 472 Mich at 315. "It is no violation of the Fourth Amendment for an officer to ask reasonable questions in order to obtain additional information about the underlying offense and the circumstances leading to its commission." *Id*. at 316. However, "although police officers may conduct certain unrelated checks during an otherwise lawful traffic stop, they may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Kavanaugh*, 320 Mich App at 300-301 (quotation marks and citation omitted). In other words, "[o]nce the constitutionally sound basis for the traffic stop has been addressed, any further extension of the detention in order to conduct on-scene investigation into other crimes or for any other reason is a Fourth Amendment violation unless new facts come to light during the traffic stop that give rise to reasonable suspicion of criminal activity." *Id*. at 301 (quotation marks, citation, and alteration omitted).

"Whether an officer has a reasonable suspicion to make such an investigatory stop is determined case by case, on the basis of an analysis of the totality of the facts and circumstances." *Id*. (quotation marks and citation omitted). "That suspicion must be reasonable and articulable[.]" *Id*. at 302 (quotation marks and citation omitted).

> "[I]n determining whether [a police] officer acted reasonably . . . , due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Terry v Ohio*, 392 US 1, 27; 88 S Ct 1868; 20 L Ed 2d 889 (1968) (examining the reasonableness of an officer's search for weapons). [*Kavanaugh*, 320 Mich App at 302 (alterations in original).]

Defendant argues that the trial court erred when it denied his motion to suppress on the basis that because defendant consented to be searched, which turned the initial traffic stop into an investigative stop, it was "not necessary for the Court to determine whether there was probable cause justifying an investigation beyond the initial traffic stop." Specifically, defendant asserts that once Deputy Kaufman concluded defendant was not intoxicated or in need of medical help, he should have issued a traffic citation and completed the stop, rather than asking additional questions related to the narcotics investigation.

Neither "[a] person's propinquity to others independently suspected of criminal activity," *People v Coscarelli*, 196 Mich App 724, 726-727; 493 NW2d 525 (1992), nor an individual's presence in an area known for crime, alone, establish reasonable suspicion, *People v Nelson*, 443 Mich 626, 636; 505 NW2d 266 (1993). Thus, Officer Daly's surveillance of defendant's car in an area he testified at the evidentiary hearing was known for high crime, and Deputy Kaufman's knowledge of that surveillance, alone, would not have justified continuation of the traffic stop beyond the time necessary to address the traffic violations.

However,

> the Fourth Amendment does not impose a "one size fits all" rule of police investigation, much less one that restricts the officer to informing the driver of the nature of the infraction, and subsequently obtaining the information necessary to fill out a citation. The Fourth Amendment requires only that the detention be

-4-

*reasonable* – that is, that it be reasonably restricted in light of all the facts available to the officer. [*Williams*, 472 Mich at 316-317.]

The record here supports the trial court's determination that defendant's detention through his consent to the search of his person was reasonable. Deputy Kaufman approached defendant's vehicle and asked if defendant was okay because he had seen defendant drive up on the grass. Deputy Kaufman's bodycam video showed that Deputy Kaufman then immediately asked defendant to step out of the vehicle, a command which does not violate the Fourth Amendment. *Pennsylvania v Mimms*, 434 US 106, 111 n 6; 98 S Ct 330; 54 L Ed 2d 331 (1977) ("We hold only that once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures.").

After defendant exited the vehicle, Deputy Kaufman pressed defendant further as to why he drove onto the grass, and defendant responded that he had been attempting to open a phone application, which Deputy Kaufman may have assumed to be a lie based on his knowledge of defendant's whereabouts just before the traffic stop. Such questioning was reasonable. Indeed:

> It is no violation of the Fourth Amendment for an officer to ask reasonable questions in order to obtain additional information about the underlying offense and the circumstances leading to its commission. For example, in addition to asking for the necessary identification and paperwork, an officer may also ask questions relating to the reason for the stop, including questions about the driver's destination and travel plans. [*Williams*, 472 Mich at 316.]

In light of defendant's unlikely explanation for his traffic violations, that questioning provided Deputy Kaufman with suspicion that warranted further limited investigation, including asking defendant if he was on parole, whether he had anything on his person that he should not have, and, just over two minutes into the traffic stop, whether he would consent to a search, to which defendant immediately agreed. In *Williams*, 472 Mich at 317, the Court held that a similar situation did not give rise to a Fourth Amendment violation, stating:

> Trooper Varoni introduced himself to [the] defendant, explained the purpose of the stop, and obtained the necessary identification and paperwork in order to complete the citation for the civil infraction of speeding. In response to a routine question about his travel plans, [the] defendant provided Trooper Varoni with an explanation that was implausible. Therefore, even before Trooper Varoni could resolve the matter of [the] defendant's violation of the traffic laws, he was presented with additional suspicious circumstances that warranted further investigation.

> Trooper Varoni acted on these new suspicions by asking [the] defendant additional questions about his travel plans and whether he had been in trouble before, and by briefly speaking with the vehicle's occupants. None of the answers provided by [the] defendant or his companions allayed Trooper Varoni's suspicions. Moreover, the entire encounter took only five to eight minutes, at which time Trooper Varoni requested and obtained defendant's consent to search the vehicle.

On the basis of the record outlined above, we come to the same conclusion here. And, as in *Williams*, 472 Mich at 317-318, "[i]t follows that defendant was not being unlawfully detained when he was asked to consent to the search," which the record demonstrates defendant did freely and voluntarily. Accordingly, the trial court did not err when it denied defendant's motion to suppress on this basis.

Defendant also asserts that the trial court erred in denying his motion to suppress because his state and federal constitutional right to be free from unreasonable searches and seizures was violated when defendant was subjected to a roadside strip search which exposed his buttocks to members of the public.[1]

The bodycam footage contradicts defendant's arguments. Although the top of defendant's buttocks were exposed, the exposure was very brief, and occurred with officers gathered closely around him. A female officer stood on the grass nearby, but there is no indication that she could see anything beyond that brief exposure, or anything at all. The exposure was also so minimal and quick that it would have been very improbable for any passersby or bystanders to have seen. And the only support defendant offers for his argument is an unpublished case, in which this Court denied the defendant's Fourth Amendment argument under very similar circumstances. Moreover, the plain-feel exception to the warrant requirement, which allows an officer to seize an item felt during an "authorized patdown" "if the officer develops probable cause to believe that the item felt is contraband," *People v Champion*, 452 Mich 92, 105-106; 549 NW2d 849 (1996), applies. Accordingly, the trial court did not err in denying defendant's motion to suppress on this basis.

## III. EXPERT WITNESS

Defendant next asserts that the trial court abused its discretion when it admitted expert testimony from Officer Daly on local drug trafficking, because he failed to show that his opinion was based upon reliable principles and methodologies as required by MRE 702.

Preserved evidentiary issues are reviewed for an abuse of discretion. *People v Unger*, 278 Mich App 210, 216; 749 NW2d 272 (2008). The version of MRE 702 in effect at the time of trial provided:[2]

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if: (1) the

---

[1] Defendant no longer asserts that the challenged search violated MCL 764.25a, and that argument would fail because MCL 764.25a applies to those arrested or detained for a misdemeanor offense or offense punishable only by a civil fine, MCL 764.25a(2), neither of which apply to defendant.

[2] "The Michigan Rules of Evidence were substantially amended on September 20, 2023, effective January 1, 2024. See 512 Mich lxiii (2023). Analysis of evidentiary issues in this opinion will follow the version of the rules in effect at the time of trial." *People v Jones*, ___ Mich App ___, ___; ___ NW3d ___ (2025) (Docket No. 362854); slip op at 3 n 3.

testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. [*People v Hawkins*, 349 Mich App 271, 275; 27 NW3d 641 (2023).]

This Court has repeatedly held, subject to certain limitations, that police officers may testify as experts in the area of drug trafficking and drug profile evidence. Drug profile evidence

has been described as an informal compilation of characteristics often displayed by those trafficking in drugs. A profile is simply an investigative technique. It is nothing more than a listing of characteristics that in the opinion of law enforcement officers are typical of a person engaged in a specific illegal activity. [*People v Murray*, 234 Mich App 46, 52-53; 593 NW2d 690 (1999) (quotation marks and citations omitted).]

While such evidence is mostly inadmissible as substantive evidence of guilt, "courts generally have allowed expert testimony to explain the significance of items seized and the circumstances obtaining during the investigation of criminal activity." *Id*. at 53. "For such expert testimony to be admissible, (1) the expert must be qualified; (2) the evidence must serve to give the trier of fact a better understanding of the evidence or assist in determining a fact in issue; and (3) the evidence must be from a recognized discipline." *Id*. (quotation marks and citation omitted).

Defendant does not challenge Officer Daly's specific testimony or argue that the prosecutor improperly used such testimony as substantive evidence of his guilt. Nor does he contest Officer Daly's specific qualifications. Rather, he asserts that Officer Daly failed to show that his testimony regarding general drug trafficking characteristics was based upon reliable principles and methodologies as required by MRE 702. But, as detailed above, this Court has repeatedly found drug-profiling to be an expert field under MRE 702 on the basis of officers' knowledge and experience, and defendant offers no specific support to the contrary. Accordingly, the trial court did not abuse its discretion when it qualified Officer Daly as an expert in local drug trafficking trends.

## IV. PROSECUTORIAL ERROR

Defendant next argues that the prosecutor denigrated defense counsel and improperly vouched for the credibility of witnesses during his rebuttal argument, and further denied defendant's right to a fair trial when he commented on defendant's post-arrest silence.

"To preserve a claim of prosecutorial error,[3] a defendant must timely and specifically challenge the prosecutor's statements or conduct." *People v Thurmond*, 348 Mich App 715, 735;

---

[3] Defendant refers to the prosecutor's action as "misconduct." Although "prosecutorial misconduct" is a commonly accepted term of art in criminal appeals, it is a misnomer when referring to allegations that do not involve violations of the rules of professional conduct or illegal activity. *People v Cooper*, 309 Mich App 74, 87-88; 867 NW2d 452 (2015). Less egregious

20 NW3d 311 (2023), citing *People v Unger*, 278 Mich App 210, 234-235; 749 NW2d 272 (2008). Defense counsel objected to the prosecutor's statements during closing argument regarding defendant's silence but did not object to the other challenged statements. Accordingly, this issue is only partially preserved.

We review de novo preserved prosecutorial error arguments "by examining the challenged remarks in context to determine whether [defendant] received a fair and impartial trial." *People v Caddell*, 332 Mich App 27, 71; 955 NW2d 488 (2020). On the other hand, unpreserved prosecutorial error arguments are reviewed for plain error. *People v Aikens*, ___ Mich App ___, ___; ___ NW3d ___ (2025) (Docket No. 368187); slip op at 2.

Because "[t]he prosecution's primary responsibility is to seek justice, rather than to secure a conviction," "the test for prosecutorial error is whether the defendant was denied a fair and impartial trial." *People v Wisniewski*, ___ Mich App ___, ___; ___ NW3d ___ (2025) (Docket No. 361978); slip op at 13. "While the prosecution is precluded from arguing facts not in evidence or mischaracterizing the evidence presented, the prosecution is free to argue all reasonable inferences that arise from the evidence." *Id*. at ___; slip op at 13.

Defendant first challenges the following statement made by the prosecutor during his closing argument: "First of all, let's talk about what [defendant] said or what he didn't say. You didn't hear him say when they were saying, hey, drug traffickers [wear] these multiple pairs of underwear and clothing. Well, I'm not no trafficker. You didn't hear him say—[.]" This comment was seemingly made in reference to defendant's lack of response to Officer Daly's comments during the search that traffickers often wear multiple pairs of clothing. Defendant argues that this comment violated his right to post-arrest, post-*Miranda*[4] silence.

> Generally,
>
> if a person remains silent after being arrested and given *Miranda* warnings, that silence may not be used as evidence against that person. *Wainwright v Greenfield*, 474 US 284, 290-291; 106 S Ct 634; 88 L Ed 2d 623 (1986). Therefore, in general, prosecutorial references to a defendant's post-arrest, post-*Miranda* silence violate a defendant's due process rights under the Fourteenth Amendment of the United States Constitution. [*People v Shafier*, 483 Mich 205, 212-213; 768 NW2d 305 (2009).]

However, a "defendant's right to due process is implicated only where his silence is attributable to either an invocation of his Fifth Amendment right or his reliance on the *Miranda* warnings." *People v Solmonson*, 261 Mich App 657, 664-665; 683 NW2d 761 (2004), citing *People v*

---

conduct involving inadvertent or technical error should be deemed "prosecutorial error." *Id*. at 88. Because defendant does not allege a violation of the rules of professional conduct or illegal activity by the prosecutor, we refer to defendant's argument as "prosecutorial error."

[4] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

*McReavy*, 436 Mich 197, 201 n 2; 462 NW2d 1 (1990), and *People v Schollaert*, 194 Mich App 158, 163; 486 NW2d 312 (1992).

In other words, if a defendant refuses to speak after being read his *Miranda* warnings, comments about that refusal are improper. *McReavy*, 436 Mich at 217-218.

> The relevant inquiry is first whether the defendant has remained silent. If so, there is an irrebuttable presumption of irrelevancy, and such silence may not be used substantively or for impeachment purposes since there is no way to know after the fact whether it was due to the exercise of constitutional rights or to guilty knowledge. Where the defendant has not maintained "silence," but has chosen to speak, the Court has refused to endorse a formalistic view of silence. [*McReavy*, 436 Mich at 218.]

As the Court stated in *McReavy*, 436 Mich at 219-220:

> We have found no authority for the proposition that a defendant's nonverbal conduct during interrogation, after a valid waiver of the right to remain silent, is an exercise of that Fifth Amendment right to remain silent or that the "description of partial silence" in such a setting is an error of constitutional dimension.

Without citation to a particular portion of either admitted bodycam video, the prosecution asserts that defendant failed to maintain silence after being arrested and read his *Miranda* warnings as "he is seen on the body camera video answer Deputy Biessel's questions with head nods (asked whether the methamphetamine in his underwear was all he had, Defendant nodded his head yes; and when whether [sic] there would be anything additional found in the car, Defendant shook his head no)." We could not confirm these nonverbal responses by defendant in the admitted bodycam footage. Nevertheless, even if defendant did in fact remain silent after being read his *Miranda* warnings, the prosecutor's comment on defendant's silence, though it should not have been made, was brief, and the trial court instructed the jury not to consider counsels' statements as evidence, *People v Zitka*, 335 Mich App 324, 348; 966 NW2d 786 (2020) (jurors are presumed to follow instructions). And in light of the overwhelming evidence of defendant's guilt beyond his silence in response to Officer Daly's comment, including his unrefuted possession of a quantity of methamphetamine large enough to demonstrate an intent to deliver, and the messages on his phone related to methamphetamine sale and delivery, we conclude that the prosecutor's statement on defendant's silence did not deny defendant a fair and impartial trial. *Wisniewski*, ___ Mich App at ___; slip op at 13.

We also reject defendant's additional unpreserved prosecutorial error arguments. Defendant asserts that the prosecutor denigrated defense counsel and improperly vouched for the credibility of witnesses based on the following statement made by the prosecutor during his rebuttal argument:

> What [defense counsel] is really asking you to do is throw your common sense out with the bathwater. That's exactly what he's asking. Let's go over a few of the things. You know, this kind of, I, I guess I kind of guess a little bit this became let's, let's attack the police officers and blame them for the Defendant carrying all

this drugs on his person. Let's blame police officers that have been dedicated to the Drug Task Force and removing these drugs off the street and Officer Daly's case for three and a half years and say it was their fault.

A " 'prosecutor may not suggest that defense counsel is intentionally attempting to mislead the jury.' " *Unger*, 278 Mich App at 236, quoting *People v Watson*, 245 Mich App 572, 592; 629 NW2d 411 (2001). Nor may a prosecutor

> question defense counsel's veracity. When the prosecutor argues that the defense counsel himself is intentionally trying to mislead the jury, he is in effect stating that defense counsel does not believe his own client. This argument undermines the defendant's presumption of innocence. [*Unger*, 278 Mich App at 236 (quotation marks and citation omitted).]

Further, "[i]t is well-settled that the prosecution is not permitted to vouch for the credibility of a witness." *Wisniewski*, ___ Mich App at ___; slip op at 15. "However, the prosecutor's comments must be considered in light of defense counsel's comments. An otherwise improper remark may not rise to an error requiring reversal when the prosecutor is responding to defense counsel's argument." *Watson*, 245 Mich App at 592-593 (quotation marks, citations, and alteration omitted).

Simply stating that defense counsel asked the jury to abandon its common sense does not amount to a suggestion that defense counsel was intentionally trying to mislead the jury. Regardless, the prosecutor's comments were made in response to defense counsel's statements during closing argument that the time listed on the TruNarc scan report created reasonable doubt that the narcotics tested were those in defendant's possession during the traffic stop. The same is true with regard to the prosecutor's statements about the officers. During his closing argument, defense counsel questioned the officers' reasons for the traffic stop and asserted that Officer Daly gave inconsistent testimony between the preliminary examination and trial. Furthermore, even if the prosecutor's statements were improper, reversal is not required. The trial court instructed the jury that the lawyer's statements and arguments are not evidence, and jurors are presumed to follow their instructions. *Zitka*, 335 Mich App at 348. Further, a timely objection and curative instruction could have alleviated any prejudice caused by the prosecutor's improper comments. See *Aikens*, ___ Mich App at ___; slip op at 3; *Zitka*, 335 Mich App at 348 (jury instructions are presumed to cure most errors).

## V. RESENTENCING

Defendant challenges his sentence on two bases, the first being that he was deprived of his right to allocution in violation of MCR 6.425. We agree.

To preserve this issue for appellate review, a defendant must object at the sentencing hearing. See *People v Bailey*, 330 Mich App 41, 66; 944 NW2d 370 (2019). Although defendant expressed dissatisfaction with the court's interruptions, he did not specifically object to the interruptions as a violation of MCR 6.425. Accordingly, this issue is unpreserved and reviewed for plain error. *Bailey*, 330 Mich App at 66.

Under MCR 6.425, the trial court must give a defendant the opportunity to speak before imposing a sentence.  MCR 6.425(D)(1)(c)(*ii*).[5]  "[A]llocution is the *defendant's* opportunity to *address the court*, not the court's opportunity to conduct an interrogation or deliver a lecture." *People v Dixon-Bey*, 340 Mich App 292, 302; 985 NW2d 904 (2022), citing *Bailey*, 330 Mich App at 67-68.  While "[t]he trial court may deliver a lecture or express its disbelief afterwards," "[d]uring allocution, it must permit the defendant a meaningful opportunity to speak." *Dixon-Bey*, 340 Mich App at 302.  The trial court failed to do so here.

At defendant's sentencing hearing, the following exchange occurred:

> *The Court*.  You, well, Mr. Freeman, what would you like to say to me before I impose sentence?

> *Defendant*.  I accept full responsibility for my actions.  I do have a lengthy record.  I admit that, Judge.

> When I came home, I was doing the right thing.  I was working.  I was going to classes, going to CMH, doing everything.  I worked 110 days straight and at that –

> *The Court*.  Well, but you were doing other things that were illegal too.

> *Defendant*.  No, not at first.

> *The Court*.  You were not?

> *Defendant*.  No, not at first.  The day I went to get hired in at my job I got fired and when I got fired --

> *The Court*.  Okay.  Whether you were doing it at first isn't my question.

> *Defendant*.  Excuse me?

> *The Court*.  But you were, you were also dealing drugs, correct?

> *Defendant*.  Oh, yes, yes, yes, yes.

> *The Court*.  Okay.

> *Defendant*.  But I'm just giving you some backdrop of what happened.

> *The Court*.  Instead of finding another job --

---

[5] The right to allocution was previously recognized in MCR 6.425(E)(1)(c).  See *Bailey*, 330 Mich App at 66.

*Defendant.* I got depressed. I was trying to find a job with my record and many years I've been locked, I've been incarcerated.

*The Court.* So you, you decided to deal drugs?

*Defendant.* Yes, ma'am.

*The Court.* For the income?

*Defendant.* Yes, ma'am. And I was using drugs as I was dealing drugs to support myself and to take care of my bills.

*The Court.* That doesn't, supporting your habit doesn't make it any better.

*Defendant.* I didn't say it did.

*The Court.* Living off the misery of others to provide yourself with an income is not good either.

Now, anything else you'd like to say?

*Defendant.* No, because you're gonna keep cutting me off anyway.

*The Court.* And what type of job were you working?

*Defendant.* ALD at a factory, twelve hours a day.

*The Court.* At a factory?

*Defendant.* Yes, ma'am.

*The Court.* Okay. There are many factories that are looking for, for employees, correct?

*Defendant.* Once again, because I barely have a work history --

*The Court.* Sir, are there not many factories that are looking for employees, yes?

*Defendant.* Yes.

*The Court.* Okay. And I am, I, I would state for the record that I am well aware that because there is, there are many open jobs that employers are seeking to fill, they are not as employers, that is, are not as rigid as they once were about prospective employees having criminal records.

Now, I don't know why you lost that job, but I do know there are reasons people lose jobs in this economy and typically it's through a fault of their own.

-12-

*Defendant.* I was working through a temp service and they said the assignment was terminated. It wasn't my fault.

*The Court.* Sir, people lose jobs for a reason. But that's not the point here.

*Defendant.* I'm about to cuss this lady out.

*The Court.* You lost a job and to provide yourself for an income, you decided to sell drugs to provide yourself with an income. Now, but providing yourself with an income in that manner introduces live, introduces misery into the lives of others. It destroys our communities and as far as I'm concerned, sir, by making that choice, and it was a choice, you were thinking of no one but yourself. It was a purely selfish act.

Methamphetamine, as you are well aware, is nothing but a scourge on this community. It is the current drug of choice. Yes, there is a market for it. And you were well aware there was a market for it, and you chose to do that rather than get a real job, rather than even look for a real job.

Again, you were thinking of yourself and you did not give a damn about the people you were hurting and supplying this to, and I don't want to hear other people would do it anyway. That doesn't make it right. You know better you. You, you are not a stranger to the criminal justice system. And frankly, based on your record, you have done nothing with your life, with most of your life, but sell drugs which destroy lives and destroy communities.

Your criminal record is so extent [sic] that under the sentencing guidelines, your score total maxed out. You could not get a higher score under the prior record variables than you did.

So to have the gall to come here and say, well, I was only trying to make a living, is one of the sorriest excuses I've ever heard for this type of behavior.

*Defendant.* That ain't what I say. You put words in my mouth.

*The Court.* Sir, I'm not expecting you, you, I gave you your chance to speak.

*Defendant.* And you cut me off when I was talking.

*The Court.* Well, what else would you like to say then?

*Defendant.* It doesn't matter now because you done made your mind up.

*The Court.* What else would you like to say?

*Defendant.* Nothing.

*The Court.* Now's your chance. Go ahead. Knock yourself out.

*Defendant.* I'll be back on appeal. I'm straight.

*The Court.* Is there anything else you'd like to say, sir?

*Defendant.* God bless you.

The above exchange demonstrates that, like the court in *Dixon-Bey*, the trial court here failed to provide defendant a meaningful opportunity to speak. The trial court's commentary can hardly be considered a single interruption or to have been for the simple purpose of seeking clarification. *Dixon-Bey*, 340 Mich App at 302. Rather, the trial court repeatedly interrupted defendant throughout his attempts to speak and chided him for his responses, resulting in defendant declining to speak further, in violation of MCR 6.425(D)(1)(c). "Under the circumstances, it is clear defendant was offered only an illusory and superficial opportunity for allocution." *Dixon-Bey*, 340 Mich App at 303.

The court's failure to comply with the court rule amounted to plain error. The trial court did not give defendant a full opportunity to inform the court of circumstances he believed the court should consider when imposing a sentence, potentially affecting the sentence the court ultimately imposed and otherwise affecting the fairness and integrity of the proceeding. See *Bailey*, 330 Mich App at 67-68. Accordingly, we vacate defendant's sentence on this basis "and remand for the limited purpose of providing [defendant] with the opportunity for allocution at resentencing." *Id*. at 68.

Resentencing does not need to be conducted by a different judge. We look to three factors to resolve such a request:

> (1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously-expressed [sic] views or findings determined to be erroneous or based on evidence that must be rejected, (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness. [*Dixon-Bey*, 340 Mich App at 304 (quotation marks and citation omitted; alteration in original).]

The trial court's give and take with defendant, and its cutting defendant off at certain times, does not show that the trial court would have substantial difficulty setting aside any previously expressed views. All that is required on remand is for defendant to be provided a meaningful allocution, and after that, the judge who presided over trial can render a sentence.

Although we are vacating defendant's sentence on this basis, for efficiency purposes we address defendant's argument that his sentence was unreasonably harsh and disproportionate.

" '[T]he standard of review to be applied by appellate courts reviewing a sentence for reasonableness on appeal is abuse of discretion.' " *Dixon-Bey*, 340 Mich App at 295-296, quoting *People v Steanhouse*, 500 Mich 453, 471; 902 NW2d 327 (2017) (alteration in original). "In *Steanhouse*, the Michigan Supreme Court clarified that 'the relevant question for appellate courts

-14-

reviewing a sentence for reasonableness' is 'whether the trial court abused its discretion by violating the principle of proportionality . . . .' " *People v Dixon-Bey*, 321 Mich App 490, 520; 909 NW2d 458 (2017), quoting *Steanhouse*, 500 Mich at 471.

Defendant concedes that his sentence was within the sentencing guidelines range. In *People v Posey*, 512 Mich 317, 326; 1 NW3d 101 (2023), the Court held "that on appeal, challenges to within-guidelines sentences are reviewed for reasonableness according to the test outlined in *Steanhouse*."

> "[T]he proper inquiry when reviewing a sentence for reasonableness is whether the trial court abused its discretion by violating the 'principle of proportionality' set forth in *People v Milbourn*, 435 Mich 630, 636; 461 NW2d 1 (1990), 'which requires sentences imposed by the trial court to be proportionate to the seriousness of the circumstances surrounding the offense and the offender.' " [*People v Posey (On Remand)*, 349 Mich App 199, 203-204; 27 NW3d 137 (2023), quoting *Steanhouse*, 500 Mich at 459-460.]

As stated by this Court in *Posey (On Remand)*, 349 Mich App at 204:

> "An appropriate sentence should give consideration to the reformation of the offender, the protection of society, the discipline of the offender, and the deterrence of others from committing the same offense." *People v Boykin*, 510 Mich 171, 183; 987 NW2d 58 (2022). With respect to sentencing and the guidelines, the key test is not whether a sentence departs from or adheres to the guidelines range. *Steanhouse*, 500 Mich at 472. The key test is whether the sentence is proportionate to the seriousness of the matter. *Id*. In regard to proportionality, the *Milbourn* Court "observed that the Legislature has determined to visit the stiffest punishment against persons who have demonstrated an unwillingness to obey the law after prior encounters with the criminal justice system." *Milbourn*, 435 Mich at 668. "The premise of our system of criminal justice is that, everything else being equal, the more egregious the offense, and the more recidivist the criminal, the greater the punishment." *People v Babcock*, 469 Mich 247, 263; 666 NW2d 231 (2003).

When a defendant challenges a within-guidelines sentence, there is a presumption of proportionality "through which the defendant bears the burden of demonstrating that their within-guidelines sentence is unreasonable or disproportionate[.]" *Posey*, 512 Mich at 359. "[T]o overcome the presumption that the sentence is proportionate, a defendant must present unusual circumstances that would render the presumptively proportionate sentence disproportionate." *People v Bowling*, 299 Mich App 552, 558; 830 NW2d 800 (2013) (quotation marks and citation omitted).

Defendant asserts that the guidelines ignored his family history and issues with drug dependency and other mental health disorders. But in imposing defendant's sentence, the court had before it defendant's PSIR, which the court acknowledged receiving, and which contained such information regarding defendant's history. And while defendant may have had a difficult past, like many offenders, the court appropriately took into consideration defendant's extensive

criminal history, as documented in his PSIR.  Furthermore, defendant has presented no unusual circumstances that would otherwise render his sentence disproportionate. *Bowling*, 299 Mich App at 558.

We affirm defendant's conviction but vacate his sentence and remand for the limited purpose of allowing defendant an opportunity for meaningful allocution at his resentencing.

We do not retain jurisdiction.

/s/ Michael F. Gadola
/s/ Christopher M. Murray
/s/ Michael J. Kelly